**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190566-U

Order filed April 30, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* G.V., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| a Minor | ) | Will County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal Nos. 3-19-0566, 3-19-0570 |
| | ) | Circuit No. 15-JA-152 |
| v. | ) | |
| | ) | |
| Vincinte V. and Sarah N., | ) | The Honorable |
| | ) | Paula A. Gomora, |
| Respondents-Appellants). | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justice Schmidt concurred in the judgment.
Justice Holdridge specially concurred.

_____

**ORDER**

¶ 1    *Held*:   In an appeal in a juvenile neglect case, the appellate court found that: (1) the trial court did not commit reversible error by admitting certain State exhibits into evidence at the new adjudicatory hearing that was held on the original neglect petition following a remand in this case; (2) the respondent mother could not challenge on appeal the trial court's ruling, which granted the State leave to immediately file another motion to terminate the respondents' parental rights and caused a change in the minor's permanency goal, because the trial court's ruling in that regard was not a final and appealable order; and (3) the trial court did not

err in again finding that the respondent father was a dispositionally unfit parent after a new dispositional hearing had been held following remand. The appellate court, therefore, affirmed the trial court's judgment.

¶ 2     The State filed a juvenile petition alleging that the minor child, G.V., was a neglected minor and seeking to make the child a ward of the court. After hearings were held, the trial court found that the child was a neglected minor and that the child's parents—respondents, Vincinte V. and Sarah N.—were dispositionally unfit parents. The trial court made the child a ward of the court and named the Department of Children and Family Services (DCFS) as the child's guardian. Several months later, the State filed a motion to terminate respondents' parental rights to the minor, which the trial court granted after holding hearings on the matter. On appeal, this court reversed the trial court's judgment and remanded the case for the trial court to hold a new adjudicatory hearing on the initial neglect petition. *In re G.V.*, 2018 IL App (3d) 180272, ¶ 34. The trial court did so and again found that G.V. was a neglected minor. A new dispositional hearing was held, and the trial court again found that respondents were dispositionally unfit parents, again made G.V. a ward of the court, and again named DCFS as G.V.'s guardian. In addition, as the dispositional hearing was concluding, the trial court granted, over respondents' objections, the State's request for leave to immediately file another motion to terminate respondents' parental rights to the minor. Respondents appeal, arguing that the trial court erred on remand by: (1) admitting certain State exhibits into evidence at the new adjudicatory hearing on the neglect petition; (2) granting the State leave to immediately file another motion to terminate respondents' parental rights at the conclusion of the new dispositional hearing; and (3) again finding that Vincinte was a dispositionally unfit parent. We affirm the trial court's judgment.

¶ 3                                I. BACKGROUND

2

¶ 4    Respondents, Sarah and Vincinte, were the biological parents of the minor child, G.V., who was born in November 2015. Shortly after G.V.'s birth, DCFS took protective custody of the minor based upon a hotline call it had received from a caseworker in a parallel agency in Connecticut, where Sarah had previously lived. The information that DCFS had received was that Sarah's two other minor children (J.A. and A.V.) had been removed from her care, that Sarah's oldest child (J.A.) lived with the child's father, and that Sarah's rights to her middle child (A.V.) were in the process of being terminated by the court in Connecticut. The information provided to DCFS also indicated that Sarah's father, with whom Sarah was living in Illinois, had lost his parental rights to her when she was a child due to physical and sexual abuse.

¶ 5    After DCFS took protective custody of G.V., the State filed a juvenile petition in the trial court seeking to have G.V. found to be a neglected minor and made a ward of the court. The petition alleged that G.V.'s environment was injurious to his welfare. Respondents were given court-appointed attorneys to represent them in the juvenile-court proceedings.

¶ 6    On May 4, 2016, the initial adjudicatory hearing was held on the juvenile neglect petition. During the hearing, the trial court allowed the State, over respondents' objections, to admit into evidence as an indicated report the entire DCFS investigatory report regarding G.V., which apparently showed that Sarah's two other minor children (J.A. and A.V.) had been removed from her care by the Department of Children and Families (DCF) in Connecticut and that Sarah had not completed the services required to rectify the conditions for removal. In addition, at the time of the initial adjudicatory hearing, the biological father, Vincinte, had not yet established his paternity of G.V. Based upon the indicated report and the status of Vincinte, the trial court found that G.V.'s environment was injurious to his welfare and that G.V. was a neglected minor.

3

¶ 7        In July 2016, a dispositional hearing was held.  At the conclusion of the hearing, the trial court found that respondents were unfit parents.  The written dispositional order indicated that Sarah was found unfit because she needed to comply with all recommended services and that Vincinte was found unfit because he had not completed an integrated assessment and had not filed a paternity case as to G.V.  The trial court made G.V. a ward of the court and named DCFS as G.V.'s guardian.  The permanency goal was set for G.V. to be returned home within 12 months.

¶ 8        Over the next several months, two permanency review hearings were held.  After the second permanency review hearing, the trial court found that respondents had not made reasonable efforts or reasonable progress toward the return home of G.V.

¶ 9        In August 2017, the State filed a motion to terminate respondents' parental rights to G.V.  After hearings were held, the trial court granted the State's motion and terminated respondents' parental rights to the minor.  Respondents appealed.

¶ 10        In October 2018, on appeal, this court found that the trial court had erred in admitting the entire DCFS investigatory report into evidence at the initial adjudicatory hearing on the neglect petition.  *G.V.*, 2018 IL App (3d) 180272, ¶ 34.[1]  In reaching that conclusion, this court noted, among other things, that: (1) the investigatory report that was admitted into evidence contained a substantial amount of information that was unverified and lacked any supporting documentation; (2) the DCFS investigator did not testify at the adjudicatory hearing; (3) the DCFS witness who did testify at the adjudicatory hearing was a placement supervisor who was familiar with the case

_____

[1] In its opinion, this court did not clearly indicate how at that stage of the proceedings—an appeal from the trial court's grant of a motion to terminate parental rights—it was able to consider and rule upon an error that was made at the initial adjudicatory hearing more than two-years earlier, although the opinion seems to imply that the trial court may not have properly admonished respondents as to their appeal rights following the dispositional ruling on the neglect petition.  See *G.V.*, 2018 IL App (3d) 180272, ¶¶ 7, 10, 38; see also *In re Ay. D.*, 2020 IL App (3d) 200056, ¶¶ 40-41 (declining to follow the decision in *G.V.* as it related to jurisdiction).

4

file but had not participated in the investigation; (4) other than testifying that the exhibit was a true and accurate copy of the investigatory report and that it qualified as an indicated report, the DCFS witness that testified provided no other foundation and did not explain whether DCFS had received the files from the Connecticut agency or was relying on the phone conversations between caseworkers; (5) there was no detailed explanation of the Connecticut findings or a certified copy of them; (6) there was no explanation of the services Sarah was required to complete in Connecticut or her progress in those service tasks; and (7) the information from the investigatory report was provided and accepted without any verified basis in the record. *Id.* ¶¶ 30-32. This court stated that the proper remedy was "to vacate all orders entered on and after the May 4, 2016, adjudicatory hearing and [to] begin anew with the wardship proceedings." *Id.* ¶ 34.

¶ 11        In August 2019, following the remand, the trial court held another adjudicatory hearing (the remand adjudicatory hearing, the remand hearing, or the current hearing) on the original neglect petition that the State had filed. Sarah and Vincinte were both present in court for the hearing and were represented by their court-appointed attorneys. At the outset of the hearing, during the opening statements, the attorneys and the trial court discussed the parameters of the prior remand and the concerns that this court had expressed in its decision regarding the evidence that had been admitted in the previous adjudicatory hearing. The State told the trial court that it was going to "fix" those problems in the current adjudicatory hearing.

¶ 12        During the hearing, the State presented the testimony of two witnesses and sought to admit three documentary exhibits into evidence. The first exhibit, People's Exhibit No. 3 (People's Exhibit No. 3 or Exhibit 3), was a three-page portion of the DCFS investigatory report regarding G.V. The first page of the exhibit was the allegation page of the investigatory report.

The allegation in this particular case was that G.V. was at a substantial risk of physical injury/environment injurious to health and welfare by neglect. Sarah was listed as the alleged perpetrator in the report, and G.V. was listed as the alleged victim. The allegation finding was listed as "[i]ndicated." As for the evidence suggesting that an incident had occurred and that the alleged perpetrator was responsible, the first page of the exhibit stated that: (1) DCFS had received a report that Sarah had lost custody of two of her children, one of whom for which Sarah had been declared unable to care; (2) a petition to relinquish Sarah's parental rights and for her second child to be adopted was filed in court in Connecticut; and (3) Sarah was provided with services in Connecticut but was unable to adequately care for her child, even with those services. With regard to the allegation rationale, the first page of the exhibit stated, among other things, that based upon Sarah's history of failure to adequately care for her oldest child, her failure to comply with services to retain custody of her oldest child, and her inability to demonstrate that she could adequately parent either child even with services provided, the newborn baby, G.V., would have been placed in real and significant danger of physical injury.

¶ 13         The second page of Exhibit 3 referred to an allegation that had been made as to Sarah's father that allegedly put G.V. in substantial risk of sexual abuse. That allegation was determined to be "[u]nfounded." The evidence section (both the evidence that supported and contradicted the allegation) on that page of the report stated that: (1) Child Protective Services in Connecticut had reported that Sarah's father had sexually and physically abused Sarah as a child and that Sarah was removed from her parents' custody as a child for that reason; (2) Sarah's father denied that he had sexually abused anyone; and (3) G.V. was never in Sarah's father's presence unsupervised since G.V. was removed from the hospital and placed into care. As for the allegation rationale, page two of the exhibit stated that the allegation was determined to be

6

unfounded because there was no evidence that G.V. had been put in substantial risk of being sexually abused by Sarah's father since G.V. was removed from Sarah's custody at the hospital and was not in Sarah's father's care. A separate section on page two of the exhibit contained a detailed description of the incident information. That description stated, among other things, that Sarah had fled from Connecticut to avoid having G.V. removed from her care and that the recent concerns about Sarah in Connecticut were that Sarah had severe mental health issues, cognitive limitations, and a history of domestic violence, and that Sarah did not have the capacity to safely parent G.V.

¶ 14    The third page of Exhibit 3 contained a listing of important names, dates, and other information with regard to the DCFS case, such as the name of the minor, the name of the DCFS worker who had taken protective custody of the minor, and the date that protective custody was taken.

¶ 15    The State's second exhibit, People Exhibit No. 2 (People's Exhibit No. 2 or Exhibit 2), consisted of copies of two adjudicatory/dispositional orders from the Connecticut court cases. The first order was entered in December 2014 and indicated that Sarah's oldest child, J.A. (born in March 2011), was found to be a neglected minor in February 2014 and that guardianship of J.A. was given to the minor's father, Christopher A. The order contained a statement at the end or bottom of the order signed by a clerk and dated October 2018 stating that it was a true copy of the order and that it had been mailed to the Commissioner of Children and Families (Commissioner). The second order was signed in May 2016 and indicated that Sarah had knowingly and voluntarily consented to the termination of her parental rights as to her middle child, A.V. (born in June 2014), and that her parental rights were, therefore, terminated. The

7

order contained a statement at the end or bottom signed by a clerk and dated October 2018 stating that it was a true copy of the order and that it had been mailed to the Commissioner.

¶ 16    The State's third exhibit, People's Exhibit No. 1 (People's Exhibit No. 1 or Exhibit 1), was the report from a psychological evaluation that had been completed on Sarah in July 2014 as part of the juvenile court proceedings in Connecticut. The evaluation had been conducted by a licensed psychologist. Attached to the front of the evaluation report was a certification of records, which had been made pursuant to section 2-18(4)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-18(4)(a) (West 2018)) and was signed by the Director of Medical Records (in this case, the psychologist who had conducted the evaluation).

¶ 17    The psychological evaluation report was lengthy and contained a vast amount of information, including information about Sarah's childhood and her relationship with her parents, the agency and court involvement in Sarah's and her children's lives, Sarah's involvement with the fathers of her children, Sarah's mental health, and certain other matters. As for Sarah's childhood, the report indicated that Sarah was born in 1988 and had spent most of her childhood in the foster-care system after her mother had accused Sarah's father of molesting Sarah, an allegation that Sarah's father denied. Sarah had graduated from high school but had never held a job and supported herself with government assistance and occasional money from her mother. Sarah did not get along well with her mother but talked to her mother on the phone almost every day. Sarah's father's parental rights had been terminated when she was two years old, and she had not seen her father since that time, although she had talked to him in the past.

¶ 18    With regard to the agency and court involvement in Sarah's and her children's lives, the report indicated that at the time of the psychological evaluation, Sarah had two children: J.A., who was born in March 2011 and was three-years old; and A.V., who was born in June 2014 and

8

was five-weeks old. Neither child was currently in Sarah's care, although she did have visits with the children. The Connecticut DCF became involved with Sarah's family shortly after J.A. was born when the hospital reported that Sarah and J.A.'s father, Christopher, had not shown an ability to adequately care for J.A.'s basic needs. J.A. was removed from Sarah and Christopher's care, was returned home almost a year later, and was removed again in February 2014 because of safety concerns.

¶ 19    In June 2014, Sarah's middle child, A.V., was born. DCF took custody of A.V. at the hospital because the agency already had custody of Sarah's other child, J.A. Sarah did not know that it was standard for DCF to take other children away and told the evaluator that DCF had kidnapped A.V. At the time of the psychological evaluation, Sarah believed that Vincente was A.V.'s father. Sarah told the evaluator that DCF refused to let A.V. go with Vincente and his wife, Dani, because Vincente and Dani would not allow DCF to come to their house if A.V. was there. DCF opened a case on Vincinte, Dani, and their children, which Sarah thought was done to keep Vincinte and Dani from getting custody of A.V.

¶ 20    As for Sarah's involvement with the fathers of her children, the psychological evaluation report indicated that there had been a history of domestic violence in Sarah's relationship with Christopher (J.A.'s father). According to Sarah, during the four years that she and Christopher were together, Christopher had pounded on her, had stepped on her head on the floor, had choked her, had hit her, and had slammed her against a wall. Sarah remained in the relationship because she did not want to take J.A. away from J.A.'s father (Christopher), as Sarah's mother had done to her when she was a child. Sarah left Christopher in about July 2013 because Christopher had beaten Sarah and her mother. Sarah did not report the beating. Sarah stated further that Christopher had raped her almost every day but that no one believed her. Sarah did

9

not report the things that Christopher had done because Christopher had threatened to kill her and she was scared of Christopher. In August 2013, the police reported to DCF that Christopher had been arrested for violating a restraining order that Sarah had obtained after she alleged that Christopher had hit, punched, and choked her in J.A.'s presence.

¶ 21 Sarah was involved with Vincinte from October 2013 until March 2014 but was no longer involved with him, thanks to DCF. According to Sarah, the social worker did not like Vincinte or their relationship and told Sarah that her lifestyle was not appropriate for J.A. and that it was not healthy for J.A. to be around Vincinte. Sarah disagreed and stated that J.A. loved Vincinte, was very close to him, and called Vincinte "dad." In addition, although Vincinte's wife, Dani, initially had a problem with the relationship, she eventually got used to it, loved J.A., and helped take care of J.A.

¶ 22 With regard to Sarah's mental health, Sarah stated during her evaluation that she had suffered from anxiety and depression all of her life. Sarah had previously been diagnosed with manic episodes and generalized anxiety disorder but had not been consistent in participating in treatment. According to Sarah, she was depressed because the state had custody of her children and was upset because she was doing everything she was told to do, but the state was giving J.A. to J.A.'s abusive father (Christopher). Sarah was not taking any medications at the time of the psychological evaluation and refused to do so, stating that she had been on medications most of her life, thanks to DCF. According to Sarah, DCF shoved pills down children's throats so that no one had to deal with the children's issues. Sarah had attended therapy from November 2013 until April 2014. During about that same time period, DCF and other groups worked with Sarah in her home. Concerns were noted in one instance where Sarah had allegedly become frustrated, yelled at J.A., and pushed J.A. backwards. Additional concerns were expressed due to Sarah's

continued yelling and lack of affection toward J.A. Concerns were also raised about the unsafe conditions in Sarah's home, with dirty diapers and garbage on the floor. Sarah did not view those conditions as safety issues for J.A. Sarah also denied that she had pushed J.A. on the prior occasion and stated that she had merely moved J.A. Sarah did not like counselors, did not find counseling helpful, and did not say much or work on anything when she was in counseling. Sarah had been in therapy since she was five years old and did not believe that she needed any further treatment. Sarah was, however, scheduled to restart therapy in August 2014 with a new counselor and was also scheduled to start parenting classes.

¶ 23        During the evaluation, a series of tests were conducted on Sarah. Results of some of the testing indicated that Sarah had strong symptoms of dependency. Sarah was passive and highly dependent on others to meet both tangible and emotional needs and found it difficult to be on her own. Because of her strong dependency needs, it was difficult for Sarah to leave a relationship, even if the relationship had very negative components. Sarah was likely to tolerate domestic violence, substance abuse, and other negative aspects to a relationship, rather than leave and risk being on her own. Her judgment with regard to relationships was poor. She was likely to allow her children to be exposed to negative situations if she felt that she was receiving a benefit from being in a particular relationship. As a result, Sarah had reported remaining in abusive or emotionally-difficult situations and did not recognize that those conflictual situations were harmful to her children.

¶ 24        Other results indicated that Sarah had significant issues around depression and anxiety and that she possibly had posttraumatic stress disorder (PTSD). Sarah looked at things in a defeatist way and had, therefore, little motivation to try to make positive changes. She got little pleasure from life and experienced chronic feelings of distress. Sarah believed that she had

11

gotten a raw deal from life and that people could not be trusted. Her family relationships were strained and conflicted. She questioned the motives of those around her and mistrusted people. Sarah tended to be withdrawn and isolated. She had likely difficulties with PTSD, panic disorder, and possible psychosis. Sarah blamed much of her difficulty on others, which made it more difficult for her to see the need for change on her part. She was angry with DCF and with Christopher and saw them both as being the reason that she was unable to have her children.

¶ 25    Sarah was also emotionally reactive. She was easily angered, had insufficient control over her emotions, and sometimes felt as though she might explode. Sarah could become physically or verbally aggressive during times when she was feeling particularly stressed. She was easily impatient with people and was prone to serious disagreements with those close to her. It was difficult for Sarah to make decisions without a strong impact from her emotions, which could lead to significant distress for children in Sarah's care, as she minimized the need for her to control her emotional expression.

¶ 26    Although Sarah clearly loved both of her children and wanted very much to be able to raise them, she had only a limited understanding of her own ability to do so and of what changes she needed to make in order to do so in a positive way. Sarah had very limited support and was not particularly emotionally stable, in order to provide stability in her parenting. In the evaluator's opinion, Sarah needed long-term therapy to work on her mood and anxiety issues, interpersonal relationships, judgment, and understanding of her children's needs. Separate domestic violence treatment and continued hands-on parenting training were also appropriate.

¶ 27    As noted above, in addition to the exhibits, the State presented two witnesses at the remand adjudicatory hearing. The first witness that the State called to testify was DCFS Administrative Case Reviewer LaTanya Hoskins. Hoskins testified that in November 2015,

while she was an investigator for DCFS, she was involved in an investigation regarding the minor child, G.V., who was born earlier that same month. Hoskins's investigation involved conversations she had with the State of Connecticut. As a result of her complete investigation into the matter, Hoskins indicated G.V.'s mother, Sarah, for substantial risk of physical injury and environment injurious to health and welfare by neglect.

¶ 28    During her testimony, Hoskins was shown People's Exhibit No. 3. Hoskins identified the exhibit as the "allegation page"[2] of the DCFS investigatory report—the page where it stated whether the allegation had been determined to be to be indicated or unfounded. In this particular case, the allegation against Sarah was determined to be indicated. The indicated finding was Hoskins's finding at the time of the report and was still Hoskins's finding as of the time of the current hearing.

¶ 29    After Hoskins's brief testimony about Exhibit 3, the State moved to admit the exhibit into evidence. Vincinte's attorney objected, claiming that additional documentation or verification was required, and Sarah's attorney objected on the basis of foundation. The trial court overruled the objections and allowed the exhibit to be admitted into evidence.

¶ 30    Hoskins testified further that she had spoken to Sarah in 2015 on the day of the temporary custody hearing. Sarah told Hoskins that what Hoskins had stated in court regarding Sarah's psychological evaluation in Connecticut was correct. According to Hoskins, People's Exhibit No. 3 was something that Hoskins had personally investigated, but at the temporary custody hearing, Hoskin's report had not yet been finished.

¶ 31    After Hoskins's testimony concluded, the State moved to admit into evidence People's Exhibit No. 2, the adjudicatory/dispositional orders from the Connecticut court. The State told

_____

[2] It is unclear from the record whether Hoskins was identifying the first page or all three pages of the exhibit as the "allegation page."

the trial court that the exhibit had a seal on it, stating, "you have to feel it, but there is a seal from the State of Connecticut on here," and represented to the trial court that the documents were properly certified. Sarah's attorney objected to admission of the exhibit, stating, in pertinent part:

> "Although I have seen the original and felt it, I don't know how it works in the State of Connecticut, but in Illinois, that would not be considered a certified document. It should be an official stamp on there saying this is certified. I agree it says it's a copy of a court order from that time in Connecticut, but I don't believe this is a reasonable certification of the orders."

Vincinte's attorney also objected, stating that the orders were not relevant and material as to Vincinte, and asked the trial court to only consider the orders for the purpose of deciding the case as to Sarah. After listening to the parties' arguments, the trial court overruled the objections and admitted People's Exhibit No. 2 into evidence.

¶ 32 The State also moved to admit into evidence People's Exhibit No. 1, the certified copy of Sarah's psychological evaluation report. No objections were made, and the exhibit was admitted into evidence.

¶ 33 Following the admission of all three exhibits, the State called Sarah to the witness stand. Sarah testified that she was the mother of G.V., who was born in November 2015. Prior to G.V.'s birth, Sarah lived in Connecticut. Sarah moved to Illinois in August 2015 when she was about six months pregnant with G.V. In Illinois, Sarah lived with her grandfather and her father.

¶ 34 As a child, Sarah had been taken into care by the State of Connecticut when she was three or four years old and had been a ward of that State until she was 19 or 20, when she signed herself out of the system. During that entire time period, Sarah's father did not regain custody of

14

Sarah. Prior to moving to Illinois, the last time that Sarah had contact with her father was in 2011 after J.A. was born.

¶ 35    While Sarah lived in Connecticut, she had two children (J.A. and A.V.). Sarah confirmed that there had been domestic violence in the home when she was in a relationship with Christopher (J.A.'s father) and admitted that she had not taken domestic violence counseling because she did not think it was necessary.

¶ 36    Sarah initially believed that Vincinte was the father of A.V. Vincinte was present when DCF took custody of A.V. and was initially part of the DCF case in Connecticut. DNA testing later determined, though, that Vincinte was not A.V.'s biological father. Sarah denied during her testimony that she had ever been in a relationship with Vincinte but admitted that she had engaged in sexual relations with him. Sarah had lived in Vincinte's house with Vincinte and his wife for a two-week period to get away from her abusive ex-boyfriend (presumably Christopher). Sarah had told Vincinte that she was pregnant with G.V. and had also told Vincinte that she was moving to Illinois. Vincinte did not try to stop Sarah from moving because he wanted Sarah to be away from her abusive ex-boyfriend. Sarah acknowledged during her testimony, however, that she was no longer in a relationship with her ex-boyfriend when she moved to Illinois. Sarah believed that Vincinte's home in Connecticut was an appropriate placement for G.V.

¶ 37    According to Sarah, when she moved to Illinois, she was no longer involved with the State of Connecticut with regard to her other two children and had been told that the cases were done. Sarah had signed over her rights to A.V. because she was harassed by her lawyer and the DCF worker and was told that she would never see A.V. again if she did not do so. Sarah was required to attend counseling and parenting classes in Connecticut and initially indicated during her testimony that she had been compliant with those services.

15

¶ 38    When Sarah was confronted with the number of absences that she had in counseling, she stated that she moved to Illinois and told the people in Connecticut that she would not be going to counseling anymore. The State pointed out to Sarah that the counseling records dated back to 2014 and that Sarah had not left Connecticut until 2015. Sarah responded that the counselor had lied and that she had gone to almost every one of her appointments. When asked by the State if everyone lied with regard to her, Sarah responded, "[m]y entire case is a lie, if you want to be technical."

¶ 39    Upon being questioned further, Sarah indicated that she had gone to domestic violence counseling on her own to learn how to deal with J.A.'s father. The State objected because no discovery had been tendered to support that testimony, and Sarah's attorney agreed that he did not have any documentation regarding the matter. Sarah testified further that she did not have a certificate or any other type of document showing that she had completed domestic violence counseling in Connecticut and stated that the counselors in Connecticut did not give attendees such documents. When Sarah was asked if she had a mistrust of the entire system, she stated, "I don't have enough words—I don't have enough words in the world to explain all of the distrust I have for this agency or any of these courtrooms."

¶ 40    After calling Sarah to testify, the State rested its case. Neither Sarah nor Vincinte presented any additional evidence. Following closing arguments, the trial court took its decision under advisement until the following morning. The attorneys indicated that neither Sarah nor Vincinte would be present in court for the court's decision the next day. Vincinte had to fly back to Connecticut, and Sarah had to take Vincinte to the airport. Sarah's and Vincinte's attorneys, however, told the trial court that they would be present in court on behalf of their clients.

16

¶ 41       At the resumed adjudicatory hearing the following day, the trial court announced its

decision.  The trial court found that the State had proven by a preponderance of the evidence that

G.V.'s environment was injurious to his welfare and that G.V. was a neglected minor.  The trial

court noted that its finding was supported by the testimony of Hoskins (the DCFS investigator),

the three exhibits admitted by the State, and the testimony of Sarah.  The trial court commented

during its ruling that it was inferring that Sarah moved to Illinois to either avoid DCF in

Connecticut from taking G.V. or to avoid being required to do services in Connecticut that she

had not yet completed with respect to her two other minor children.

¶ 42       The next month (September 2019), the trial court held a dispositional hearing with regard

to G.V.  Sarah and Vincinte were both present in court for the hearing and were represented by

their court-appointed attorneys.  On motion of the State, the dispositional report and the service

plan were admitted into evidence without objection.  Among other things, the dispositional

report indicated that both parents (Sarah and Vincinte) had certain services yet to complete; both

parents were currently cooperating with DCFS; and both parents were visiting with the minor,

either in person (Sarah) or by telephone (Vincinte).  In addition, and of relevance to this appeal,

the service plan indicated that although Vincinte had no criminal history, his mental history and

financial stability were unknown to DCFS.

¶ 43       Sarah testified in her own behalf at the dispositional hearing and stated that the first time

she had seen that particular service plan was the morning of the dispositional hearing, although

the DCFS worker had discussed the service plan with her previously.  Sarah confirmed, however,

that she knew what services were required.

¶ 44       Sarah also called the DCFS caseworker, Theresa Bruns, to testify.  Bruns stated that she

had told Sarah the services that Sarah needed to complete.  Sarah was asked to perform a

domestic violence counseling assessment, a psychological evaluation, and a parenting capacity assessment (and, presumably, to comply with any recommendations that were made). Vincinte was required to have an interstate compact home study completed. Although the paperwork for the interstate compact had been filled out, the home study had not yet been done.

¶ 45    After all of the evidence had been presented, the attorneys made their closing arguments. Of relevance to this appeal, Vincinte's attorney argued that the trial court should find that Vincinte was not unfit or should delay its ruling on the matter until DCFS had completed its home study and had determined whether G.V. should be placed with Vincinte. In the alternative, Vincinte's attorney stated that he was "asking at least that there be a finding of unable at this point and that we set the case for dispositional hearing—or permanency review."

¶ 46    Following the completion of the arguments, the trial court made its ruling. The trial court found that both respondents were dispositionally unfit and that it was in G.V.'s best interest to be made a ward of the court. The trial court stated that the basis of its finding was that both respondents had services yet to complete in their service plan and noted the services to which Bruns had testified. In addition, with regard to Vincinte, the trial court commented that over the past three years, there had been resistance to providing the names of the individuals who were living in Vincente's home and to providing background-check information. The trial court indicated, although somewhat implicitly, that the permanency goal was to return the minor home and noted that respondents' visits with the minor were at the discretion of the agency but should be frequent and liberal. A written dispositional order was later entered.

¶ 47    As the trial court was finishing announcing its ruling, the State asked leave to file another motion to terminate respondents' parental rights to G.V. and asked the trial court to set the permanency goal to substitute care pending a court ruling on the termination motion. The State

18

pointed out to the trial court that the policy of DCFS under such circumstances was that visits with the minor would take place only once per month. Respondents' attorneys objected to the State's request for leave to file the termination motion. The trial court overruled the objections and reminded respondents' attorneys that they were free to file any motions they wanted with regard to the State's motion to terminate parental rights. The trial court also ruled, however, that it was going to keep respondents' visits with the minor at once a week for two hours as the court had previously ordered.

¶ 48 Respondents filed separate appeals, and this court later consolidated those appeals for appellate review on the motion of the minor.

¶ 49         II. ANALYSIS

¶ 50      A. The Finding of Neglect and the Admission
       of Evidence at the Remand Adjudicatory Hearing

¶ 51 On appeal, Sarah argues that the trial court erred in finding that G.V. was a neglected minor. Sarah asserts that the remand adjudicatory hearing did not conform to this court's mandate from the previous appeal. More specifically, Sarah contends that the trial court erred by admitting the DCFS indicated report (People's Exhibit No. 3) into evidence at the remand hearing because the report contained inadmissible hearsay and lacked sufficient foundation (a certification or verification statement) to be admitted as a business record. Sarah contends further that the trial court also erred by admitting the adjudication/disposition orders from Connecticut (People's Exhibit No. 2) into evidence at the remand hearing because the orders did not contain a proper certification or attestation to qualify as self-authenticating documents under Illinois Rule of Evidence 902 (eff. Sept. 28, 2018). Finally, Sarah maintains that although her psychological evaluation report from Connecticut (People's Exhibit No. 1) was properly admitted at the remand hearing as a business record, without the other two exhibits, the

19

evaluation lacked a "predicate" and became mere speculation. For all of the reasons stated, Sarah asks that we reverse the trial court's finding of neglect and that we dismiss this case without remand.

¶ 52    As with Sarah, Vincinte also argues on appeal that the trial court erred in its neglect finding. Vincinte asserts that the trial court committed the same error at the remand adjudicatory hearing that it had committed at the original adjudicatory hearing by admitting the DCFS report into evidence as an indicated report under the hearsay exception (705 ILCS 405/2-18(4)(b) (West 2018)), even though the report contained a substantial amount of information that was unverified and that lacked any supporting documentation. According to Vincinte, the entire report was merely a summary of the information that came from Connecticut, which this court previously ruled was inadmissible hearsay. For that reason, Vincinte asks this court to again reverse the trial court's finding of neglect and, presumably, to remand this case for further proceedings.

¶ 53    The minor argues that the trial court's evidentiary rulings at the remand adjudicatory hearing were proper and that the trial court's finding of neglect should be upheld. As for the DCFS indicated report, the minor asserts that the evidence presented by the State at the remand adjudicatory hearing rectified all of the concerns stated by this court in the prior appeal since the investigator testified at the remand hearing about her investigation and her indication of the hotline report, including her contact with Connecticut and her confirmation of the psychological evaluation findings with Sarah at the temporary custody hearing. Furthermore, the minor insists, much of the information contained in the indicated report was confirmed by Sarah's own testimony at the remand hearing and by the psychological evaluation report, which was admitted into evidence. As for the court orders from Connecticut, the minor asserts that the record in this case shows that during the remand adjudicatory hearing, both Sarah's attorney and the Assistant

State's Attorney represented to the trial court that the exhibit contained a raised seal and that Vincente's attorney did not make an objection to the exhibit on that basis. In addition, the minor maintains, Evidence Rule 902 does not require that the signature on a sealed document be made under oath. Finally, in the alternative, the minor asserts that even if the trial court erred in admitting the two exhibits, any error that occurred was harmless because the trial court's finding of neglect was not against the manifest weight of the remaining, properly admitted, evidence. For all of the reasons set forth, the minor asks, therefore, that we affirm the trial court's finding of neglect.

¶ 54        The State also argues that the trial court's finding of neglect was proper and should be upheld. The State asserts that the trial court properly admitted the DCFS indicated report into evidence at the remand adjudicatory hearing, not for the truth of the matters asserted, but to show the reasons that the DCFS investigation was started. Thus, the State contends that the remand hearing entirely conformed with this court's mandate from the previous appeal. As to the adjudication/disposition orders from Connecticut, the State points out that Sarah's attorney acknowledged at the remand hearing that he could feel the raised seal on the document. The State asserts, therefore, that any error in not submitting the original document as part of the record in this appeal so that the presence of a raised seal could be proven must be construed against Sarah and Vincinte as the appellants. The State asserts further that since the Connecticut orders contained both a raised seal and an attestation that they were true and correct copies, the documents complied with the self-authentication requirements of Evidence Rule 902(1) and were properly admitted. In the alternative, the State maintains that even if the two exhibits (People's Exhibit Nos. 3 and 2) were admitted in error, the trial court's finding of neglect should still be upheld because the remaining evidence presented at the remand hearing was of such strength that

21

it overwhelmingly proved the neglect petition and made any error that occurred harmless. For all of the reasons set forth, the State asks that we affirm the trial court's finding of neglect.

¶ 55 Although a trial court's finding of neglect in a juvenile proceeding will generally not be reversed on appeal unless it is against the manifest weight of the evidence (see *In re A.P.*, 2012 IL 113875, ¶ 17), in this particular case, the issue raised by the parties focuses upon the admissibility of evidence at the adjudicatory hearing. A determination as to the admissibility of evidence at an adjudicatory hearing rests in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *In re A.W., Jr.*, 231 Ill. 2d 241, 256 (2008). The threshold for finding an abuse of discretion is high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). In addition, even if the trial court committed an abuse of discretion in the admission of evidence, a new trial should not be ordered unless the trial court's erroneous ruling appears to have affected the outcome of the trial. See *Leona W.*, 228 Ill. 2d at 460; *Troyan v. Reyes*, 367 Ill. App. 3d 729, 732-33 (2006); *In re J.C.*, 2012 IL App (4th) 110861, ¶ 29 (recognizing that errors in the admission of evidence at an adjudicatory hearing may be deemed harmless where ample evidence supports a trial court's finding of neglect).

¶ 56 A wardship proceeding constitutes a significant intrusion into the sanctity of the family and should not be undertaken lightly. *A.P.*, 2012 IL 113875, ¶ 18. The primary consideration in such a proceeding is the best interests of the minor involved, and the focus is on whether that particular minor is neglected, not on whether the minor's parents are neglectful. *Id.* ¶¶ 18-20. At the trial level, the burden is on the State to prove the allegations of neglect by a preponderance of

the evidence. *Id.* ¶ 17. If the State fails in that burden, the neglect petition must be dismissed. *Id.*

¶ 57 There is no fixed meaning for the term "neglect" but it has been generally defined as the failure to exercise the level of care that is required under the circumstances, and it encompasses both the willful and the unintentional disregard of parental duty. *Id.* ¶ 22. Pursuant to the Act, neglect may be found where a minor's environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2018); *A.P.*, 2012 IL 113875, ¶ 22. In general, the term "injurious environment" has been defined as the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *A.P.*, 2012 IL 113875, ¶ 22. Like the term "neglect," however, the term "injurious environment" does not have a fixed meaning and must be determined from the unique facts of each particular case. See *id.*

¶ 58 "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). Evidence of abuse or neglect of one minor is admissible on the issue of the abuse or neglect of any other minor for whom the parent is responsible. 705 ILCS 405/2-18(3) (West 2018). Such evidence, however, does not constitute conclusive proof of neglect of the minor in question. *Arthur H.*, 212 Ill. 2d at 468. Rather, in determining whether a particular minor is neglected, a trial court should consider not only the circumstances surrounding the prior neglect of that minor's sibling or siblings but also the care and condition of the minor in question. *Id.* When faced with evidence of prior neglect by a parent or parents, a trial court need not wait to take action until after each particular minor suffers an injury. *Id.* at 477.

23

¶ 59        At an adjudicatory hearing in a juvenile neglect proceeding, the trial court must determine whether the minor is a neglected minor as alleged in the petition. See 705 ILCS 405/2-18(1) (West 2018); *J.C.*, 2012 IL App (4th) 110861, ¶ 18. The standard of proof and the rules of evidence in the nature of civil proceedings generally apply in an adjudicatory hearing. See 705 ILCS 405/2-18(1) (West 2018); *J.C.*, 2012 IL App (4th) 110861, ¶ 18. Although hearsay may be admitted in a dispositional hearing, it may not be admitted in an adjudicatory hearing, unless it falls within an exception under the Act. *G.V.*, 2018 IL App (3d) 180272, ¶ 28. One such exception is provided for in section 2-18(4)(b) of the Act, the statute at issue here, which allows any indicated report filed pursuant to the Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.* (West 2018)) to be admitted into evidence at an adjudicatory hearing. See 705 ILCS 405/2-18(4)(b) (West 2018); *J.C.*, 2012 IL App (4th) 110861, ¶ 17; *G.V.*, 2018 IL App (3d) 180272, ¶ 27. Another relevant provision, Illinois Rule of Evidence 902 (eff. Sept. 28, 2018), allows for the self-authentication of certain domestic public documents that bear a seal, such as the one that was allegedly present on People's Exhibit No. 2 (the adjudication/disposition orders from Connecticut).

¶ 60        In the present case, however, we need not determine whether the DCFS indicated report (People's Exhibit No. 3) or the adjudicatory/dispositional orders (People's Exhibit No. 2) were properly admitted into evidence at the adjudicatory hearing on the neglect petition because the remainder of the evidence presented—the admissibility of which is not contested in this appeal—overwhelmingly established that G.V. was a neglected minor. See 705 ILCS 405/2-3(1)(b) (West 2018) (indicating that neglect may be found where a minor's environment is injurious to his or her welfare); 705 ILCS 405/2-18(3) (West 2018) (allowing evidence of abuse or neglect of one minor to be admitted on the issue of the abuse or neglect of any other minor for whom the

24

parent is responsible); *A.P.*, 2012 IL 113875, ¶ 22 (setting forth the definition of an injurious environment); *Arthur H.*, 212 Ill. 2d at 468 (describing the anticipatory neglect theory); *Leona W.*, 228 Ill. 2d at 460 (recognizing that an error in the admission of evidence does not require a reversal unless the error appears to have affected the outcome of the trial); *Troyan*, 367 Ill. App. 3d at 732-33 (same); *J.C.*, 2012 IL App (4th) 110861, ¶ 29 (same). Specifically, Sarah's own testimony established that she had two minor children in Connecticut who were removed from her care by DCF for safety concerns; that care of the children had not been restored to Sarah, even though she had been provided with services to help her improve her parenting skills; that Sarah had not completed all of the services she had been given in Connecticut; that Sarah had left Connecticut when she was about six months pregnant with G.V. and had moved to Illinois to live with her grandfather and her father; that Sarah had been removed from her father's care as a child based upon allegations that her father had molested her; and that Vincinte knew that Sarah was pregnant with G.V. and that she was moving to Illinois, but did not make any effort to try to stop Sarah from doing so or to protect G.V.

¶ 61        The psychological evaluation report confirmed much of that information and provided more detail. In addition, the psychological report established that Sarah had problems with anxiety, depression, PTSD, and possibly psychosis. She was highly dependent on others to meet her tangible and emotional needs, had difficulty ending even negative relationships, and did not recognize that those conflictual situations were harmful to her children. She was emotionally reactive, angered easily, and had insufficient control over her emotions. She could become physically or verbally aggressive when stressed and had difficulty making decisions without a strong impact from her emotions, which could lead to significant distress for children in Sarah's care, as she minimized the need for her to control her emotional expression. Sarah had very

25

limited support and was not particularly emotionally stable, in order to provide stability in her parenting. Finally, although the psychologist who evaluated Sarah opined in the report that Sarah needed long-term therapy to work on psychological issues and that domestic violence treatment and continued hands-on parenting would also be appropriate for Sarah, there was no indication that Sarah had successfully completed the recommended treatment.

¶ 62        In sum, after reviewing Sarah's testimony and the psychological evaluation report, we find that the neglect petition was overwhelmingly proven, even without consideration of the State's other exhibits. We, therefore, conclude that any error in the admission of the other exhibits would not have affected the outcome of this case and was harmless. See *Leona W.*, 228 Ill. 2d at 460; *Troyan*, 367 Ill. App. 3d at 732-33; *J.C.*, 2012 IL App (4th) 110861, ¶ 29. Accordingly, we reject respondents' challenge to the admissibility of the evidence at the remand adjudicatory hearing and uphold the finding of neglect.

¶ 63                    B. Sarah's Challenge to the Filing of the
                Termination Motion and the Changing of the Permanency Goal

¶ 64        As her second issue on appeal, Sarah argues that the trial court erred in granting the State leave to immediately file another motion to terminate respondents' parental rights at the conclusion of the new dispositional hearing on the initial neglect petition. Sarah asserts that the trial court's ruling deprived her of due process because it allowed the State to change the minor's permanency goal without prior notice having been given to Sarah and without a prior permanency review hearing having been held. As the minor correctly notes, however, permanency orders are temporary in nature and are not final and appealable orders.[3] *In re S.B.*,

---

[3] The State argues that the trial court's rulings, allowing the State to file the termination motion and changing the permanency goal of the minor, were proper. Because we have found that we do not have jurisdiction to rule upon the merits of this issue, we need not address the State's argument further.

373 Ill. App. 3d 224, 226 (2007). We, therefore, have no jurisdiction to rule upon this issue and accordingly dismiss it. See *id.*

¶ 65                                    C. Vincinte's Challenge to the Finding of Parental Unfitness

¶ 66        As his second issue on appeal and the final issue to be addressed in this case, Vincinte argues that the trial court erred in finding after the new dispositional hearing that he was an unfit parent. Vincinte asserts that the trial court's ruling was erroneous because the finding of neglect was based solely upon Sarah's conduct and the State failed to present any evidence in the dispositional hearing to establish that Vincinte was an unfit parent. Thus, Vincinte contends, that the trial court improperly shifted the burden of proof in the hearing to Vincinte to show that he was a dispositionally fit parent, rather than requiring the State to prove that Vincinte was a dispositionally unfit parent. In making that claim, Vincinte notes that although the trial court based its finding on the fact that a home study had not yet been completed, no evidence was presented by the State to establish when the home study was ordered, why the home study had not yet been completed, or when the home study would be completed, and the trial court seemed to just merely assume that those processes were addressed in a timely manner following the remand in this case. For all of the reasons stated, Vincinte asks that we reverse the trial court's finding that he was a dispositionally unfit parent and, presumably, that we remand this case for further proceedings.

¶ 67        The minor argues that the trial court's ruling was proper and should be upheld. The minor asserts first that Vincinte's challenge to the trial court's finding of parental unfitness is forfeited and moot because Vincinte's attorney asked the trial court at the dispositional hearing to find that Vincinte was "unable" to care for the minor, rather than "unfit," and, therefore, conceded that an order of wardship was appropriate in this case. Second, and in the alternative,

27

the minor asserts that the trial court's dispositional finding was properly based upon the fact that Vincinte had not yet completed services (the home study and the recommendations contained therein) and had been resistant to facilitating the completion of services over the past 3½ years. In making that assertion, the minor notes that contrary to Vincinte's contention on appeal, the finding of neglect was not based solely upon the conduct of Sarah but was also based upon Vincinte's failure to take action to try to prevent Sarah from leaving the State of Connecticut with G.V. prior to G.V's birth or to protect G.V. after G.V.'s birth. Thus, the minor contends that the trial court did not improperly shift the burden of proof to Vincinte at the dispositional hearing and that the trial court's finding of parental unfitness was not based upon "no evidence" as Vincinte claims. For all of the reasons set forth, the minor asks that we affirm the trial court's finding that Vincinte was a dispositionally unfit parent.

¶ 68    The State also argues that the trial court's finding of parental unfitness was proper and should be upheld. The State asserts that the evidence presented at the dispositional hearing showed that although Vincinte had been involved in this case for the past 3½ years and had been put on notice by the neglect petition that his fitness would be at issue, he had only just started cooperating with DCFS in late 2019 and was essentially an "unknown" to the agency. The State asserts further that the finding of unfitness was Vincinte's own fault since Vincinte's refusal to cooperate with DCFS over the past several years prevented DCFS from confirming whether Vincinte's home was an appropriate placement for the minor. For those reasons, the State asks that we affirm the trial court's finding that Vincinte was a dispositionally unfit parent.

¶ 69    A trial court's dispositional finding of parental unfitness made pursuant to section 2-27 of the Act (705 ILCS 405/2-27 (West 2018)) will not be reversed on appeal unless it is against the manifest weight of the evidence. See *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A trial court's

28

finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion. *Id.* at 102, 104. Because of the trial court's position as trier of fact, deference is given to the trial court's findings of fact in a juvenile-neglect proceeding. *Id.*

¶ 70    Section 2-27 of the Act provides that a minor who has been adjudged a ward of the court may be placed with someone other than his or her parents if the trial court determines that the parents are either "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2018); *In re April C.*, 326 Ill. App. 3d 245, 256-57 (2001). The standard of proof for a trial court's section 2-27 finding of parental unfitness that does not result in a complete termination of all parental rights is by a preponderance of the evidence. *April C.*, 326 Ill. App. 3d at 257. In making that determination, all relevant and helpful evidence may be considered. 705 ILCS 405/2-22(1) (West 2018); *April C.*, 326 Ill. App. 3d at 261.

¶ 71    In the present case, after reviewing the record, we conclude that the trial court did not err in finding that Vincinte was a dispositionally unfit parent. The evidence presented at the dispositional hearing established that although Vincinte had no criminal history and was currently cooperating with DCFS, he still had services left to complete (the home study and any recommendations contained therein) and his mental and financial history were not yet known by DCFS. In addition, as the trial court noted, during previous years in this case, Vincinte had refused to provide background-check information to DCFS and had refused to provide DCFS with information about who was living in his home. Thus, based upon the evidence presented at

29

the dispositional hearing, we find that the trial court's determination that Vincinte was an unfit parent was not against the manifest weight of the evidence. See *A.W.*, 231 Ill. 2d at 102-04.

¶ 72 In reaching that conclusion, we decline to rule that Vincinte's challenge to the trial court's parental unfitness finding was forfeited or moot on appeal, as asserted by the minor in this case. Although in making his argument at the dispositional hearing, Vincinte's attorney requested that the trial court find, in the alternative, that Vincinte was "unable," rather than "unfit," to care for the minor, the trial court made only a finding of parental unfitness. Thus, we are not convinced that Vincinte conceded in the trial court that he was an unfit parent. Compare *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 31 (indicating that the respondent mother's challenge to the parental unfitness determination was forfeited and moot on appeal where the respondent mother conceded at the dispositional hearing that she was unable to care for the minor, the trial court found that the respondent mother was both unable and unfit to care for the minor, the respondent mother on appeal challenged only the parental unfitness finding and not the finding that respondent mother was unable to care for the minor, and either finding would have been sufficient to justify the trial court's ruling).

¶ 73                                III. CONCLUSION

¶ 74 For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 75 Affirmed.

¶ 76 JUSTICE HOLDRIDGE, specially concurring:

¶ 77 I write separately to reiterate that this court failed to consider its jurisdiction to vacate the adjudicatory and dispositional orders in *G.V.*, 2018 IL App (3d) 180272, ¶ 34. See *Ay.D.*, 2020 IL App (3d) 200056, ¶¶ 37-41. Since the respondents appealed following the termination of their parental rights, which occurred well beyond 30 days after the dispositional order, the court only

30

had jurisdiction to vacate orders entered *subsequent to* the dispositional order. *G.V.*, 2018 IL App (3d) 180272, ¶ 45; see *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 50.

¶ 78      Despite the erroneous decision in *G.V.*, 2018 IL App (3d) 180272, I wholly agree with the majority's analysis and affirmance of the circuit court's judgment in this case. In contrast to the first appeal, this court now has jurisdiction to review the validity of the adjudicatory and dispositional orders as the respondents appealed within 30 days of the court's dispositional order. See *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).