# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re J.C.*, 2012 IL App (4th) 110861

---

| | |
|---|---|
| Appellate Court Caption | In re: J.C., T.C., B.C., T.K., B.K., A.K., and J.H., Minors, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. ELISHA HALLAM, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0861 |
| Filed | February 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The finding that respondent's children were neglected was affirmed, notwithstanding the trial court's error in admitting the State's exhibits, including the entire investigatory file on respondent, on the ground that the exhibits constituted "indicated reports" pursuant to section 2-18(4)(b) of the Juvenile Court Act, since the exhibits contained more information than was necessary to show evidence of "indicated reports" involving respondent and her children and more information than was relevant to the allegations against respondent, but the error was harmless where there was ample evidence to support the finding of neglect, even excluding the exhibits. |
| Decision Under Review | Appeal from the Circuit Court of Livingston County, No. 10-JA-9; the Hon. Robert M. Travers, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Randell S. Morgan, Public Defender, of Pontiac, for appellant.

Thomas J. Brown, State's Attorney, of Pontiac (Patrick Delfino, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE McCULLOUGH delivered the judgment of the court, with opinion.

Justices Steigmann and Pope concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Elisha Hallam, argues the trial court erred by finding her children neglected. She contends the court admitted and considered evidence at the adjudicatory hearing that should have been ruled inadmissible. We affirm.

¶ 2        Respondent is the mother of seven children, J.C. (born January 5, 2000), T.C. (born December 14, 2000), B.C. (born May 16, 2002), T.K. (born October 7, 2004), B.K. (born January 2, 2006), A.K. (born December 24, 2006), and J.H. (born June 22, 2010). In September 2010, the State filed a first amended petition for adjudication of wardship. It alleged respondent's children were neglected because their environment was injurious to their welfare due to (1) respondent's use of illegal drugs while pregnant with J.H., (2) respondent's use of heroin in the children's presence, (3) lack of supervision by respondent, (4) respondent's failure to ensure that the children were clean and free of head lice, and (5) respondent's failure to attend court-ordered substance-abuse treatment.

¶ 3        On January 28 and May 17, 2011, the trial court conducted the adjudicatory hearing in the matter. The State presented the testimony of T.C., who stated he was 10 years old. He described living in various places with respondent and his siblings, including a house, an apartment, and a trailer. T.C. testified he found needles at each residence in bags, in cabinets, or on shelves. He described a needle he found in the trailer as being white with an orange cap. Evidence showed T.C. and his family lived in the trailer immediately prior to when the children were taken into care. While living in the trailer in May or June 2010, T.C. observed respondent in a bathroom with a belt around her arm and sticking a needle into her arm. T.C. stated his two younger brothers were with him at the time and the needle he observed respondent using was the same type of needle he found in his family's various residences on other occasions.

¶ 4        Jeff Hunt testified he worked for the Department of Children and Family Services (DCFS) and, from June 2009 to June 2010, was the intact family caseworker for respondent and her children. On June 24, 2010, respondent's children were taken into protective custody.

At that time, respondent had recently been hospitalized and given birth to her youngest child, J.H. On June 24, Hunt spoke with respondent and confronted her with the results of a test performed at the hospital. Respondent acknowledged to Hunt that she had a "positive screen" but asserted it was the result of taking Tylenol 3 with codeine prior to her hospital admission. Respondent also acknowledged that she did not have a prescription for that substance.

¶ 5    Nicole Kingsby testified she worked for the Livingston County probation department and, in November 2009, began supervising respondent on probation. At that time, respondent was ordered to obtain a substance-abuse evaluation and complete treatment. Kingsby referred respondent to Angela Walker, a substance-abuse counselor with the Institute for Human Resources. Walker testified she evaluated respondent in January and February 2010 and diagnosed her with opioid and cannabis dependence. Heroin was respondent's drug of choice. Walker stated respondent reported that her drug use increased from very little use at age 17 to daily use by the age of 25. Walker recommended respondent attend individual counseling sessions twice a month but respondent failed to comply with that recommendation.

¶ 6    Theresa Ciardini testified she worked for DCFS as a child protection investigator. On June 24, 2010, Ciardini took protective custody of respondent's six oldest children. Respondent's newborn infant was taken into protective custody the following day after being released from the hospital. Upon taking the older children into protective custody, Ciardini observed that the children did not appear to have been bathed in a while. She noted their clothes were unclean and there was an odor about them. The four oldest children were examined by a doctor and found to have head lice.

¶ 7    The State asked Ciardini to identify two exhibits. She identified People's exhibit No. 1 as the "completed investigation that [she] submitted" and agreed it was "an indicated report that was filed pursuant to the Abused and Neglected Child Reporting Act" (Reporting Act) (325 ILCS 5/1 through 11.8 (West 2010)). Ciardini described People's exhibit No. 2 as "a prior investigation with" DCFS and recognized it as an indicated report that was already in the system involving respondent and her family, and also one that had been filed pursuant to the Reporting Act.

¶ 8    People's exhibit Nos. 1 and 2 contained over 200 and 100 pages, respectively. Ciardini testified the first 43 pages of People's exhibit No. 1 and the first 48 pages of People's exhibit No. 2 were computer printouts from DCFS's computer system. She stated investigators entered information from their investigations into that system. The resulting printout was labeled "Handoff Document" and comprised the "entire investigation." Ciardini testified the remaining documents in People's exhibit Nos. 1 and 2 were supporting material that was gathered from witnesses and other people involved in the case. She stated that any documentation that was gathered by an investigator was "put in the hard copy file along with the printout from the computer."

¶ 9    Ciardini testified the printouts contained information regarding the initial reports of neglect, taking the children into protective custody, and the outcome of the shelter-care hearing. The initial page of each printout listed "attachments" under the following headings: (1) intake summary, (2) person/allegations/relationships/protective custody, (3) assessment,

(4) child endangerment risk assessment protocol (CERAP) safety, (5) notes, and (6) not applicable/waiver request. Ciardini agreed that the exhibits at issue contained only documents she used during the regular course of performing her duties as a DCFS investigator and that each exhibit was prepared within a reasonable time after the investigations began.

¶ 10      Information from the DCFS computer printout in People's exhibit No. 1 showed, on June 23, 2010, a report of suspected child abuse or neglect was made to DCFS by a hospital social worker. Respondent was the alleged perpetrator and the allegations against her were "substantial risk of physical injury/environment injurious to health and welfare." A narrative regarding the report shows respondent had given birth to J.H. on June 22, 2010, and the reporter was concerned J.H. was at risk due to respondent's history. Respondent provided inconsistent information regarding the number of children in her care and tested positive for opiates. Also, she had not received any prenatal care during her pregnancy with J.H. even though her last child had needed a blood transfusion at birth and respondent had been informed that she would need certain injections during subsequent pregnancies. People's exhibit No. 1 showed the report was determined to be "indicated."

¶ 11      The computer printout also contained documents identified as DCFS case, contact, or supervisory notes dated from June to August 2010. Further, attached to the printout were several documents, including child identification forms, a notice to respondent of suspected child abuse or neglect, respondent's domestic-violence and substance-abuse screens, home-safety checklists for investigation specialists, placement authorization forms, checklists for children at initial placement, medical professional's written confirmation of suspected child abuse/neglect report, notice of foster-care placement, the shelter-care report, the original petition for adjudication of wardship, a notice of rights for respondents in juvenile court proceedings, the temporary shelter-care order, Department of Public Aid temporary mediplan cards, DCFS new client intake forms, health service encounter forms, DCFS data sheets, and DCFS child/caregiver matching tool forms.

¶ 12      People's exhibit No. 2's computer printout similarly showed a report of abuse or neglect regarding respondent and her children. That report was made on June 18, 2009, by a police officer and alleged inadequate supervision by respondent of her six oldest children. A narrative concerning the report showed the reporting police officer discovered respondent's children, ranging from two to nine years of age, wandering around a city park unsupervised. The officer returned the children home and found respondent falling asleep on her porch. The same date, the officer discovered T.K. and B.K. walking the streets unsupervised at 11 p.m. while attempting to get money for respondent. A police officer returned T.K. and B.K. home and found respondent passed out on the living room floor. The officer had a difficult time waking respondent. This report was also determined to be "indicated."

¶ 13      Again the DCFS computer printout contained case, contact, and supervisory notes dated from June to July 2009. Attached to the printout were documents, including a notification to respondent of suspected child abuse or neglect, respondent's domestic-violence and substance-abuse screens, home-safety checklists for investigation specialists, county incident reports, criminal history data for respondent and the children's fathers, and DCFS notifications of the recommended indicated findings of child abuse or neglect.

-4-

¶ 14    Respondent objected to admission of the State's exhibits on the basis of hearsay and argued that they were not simply "indicated reports," admissible pursuant to section 2-18(4)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-18(4)(b) (West 2010)), but complete DCFS case files. The trial court admitted the exhibits in their entirety. On February 7, 2011, between the two adjudicatory hearing dates, respondent filed a motion asking the trial court to reconsider the admission of the State's exhibits. On May 17, 2011, the court denied the motion to reconsider and entered its adjudicatory order, finding the children neglected due to an environment injurious to their welfare.

¶ 15    On August 3, 2011, the trial court entered a dispositional order. It found respondent unfit to care for, protect, train, educate, supervise, or discipline her children and placement in her care would be against their best interests. The court adjudicated the minors neglected, made them wards of the court, and placed their custody and guardianship with DCFS. (The children's fathers were also found unfit and the children removed from their care; however, neither father is a party to this appeal.) On August 11, 2011, respondent filed a motion to reconsider the court's dispositional order. On September 23, 2011, the court denied her motion.

¶ 16    This appeal followed.

¶ 17    On appeal, respondent argues the trial court erred by finding her children neglected. She contends, at the adjudicatory hearing, the court improperly admitted and relied upon the State's two exhibits. Respondent maintains the exhibits contained information in excess of what is permitted by section 2-18(4)(b) of the Act, providing for the admission of "indicated reports" into evidence.

¶ 18    At the adjudicatory hearing, the trial court determines whether a minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2010). "The standard of proof and the rules of evidence in the nature of civil proceedings *** are applicable" at an adjudicatory hearing. 705 ILCS 405/2-18(1) (West 2010). Generally, "[w]hether evidence is admissible is within the discretion of the circuit court, and its ruling will not be reversed absent an abuse of that discretion." *In re A.W.*, 231 Ill. 2d 241, 256, 897 N.E.2d 733, 742 (2008).

¶ 19    However, the issue presented by this case concerns what material physically constitutes an "indicated report" within the meaning of the Act. As such, it involves matters of statutory construction, which are subject to a *de novo* standard of review. *In re I.H.*, 238 Ill. 2d 430, 438, 939 N.E.2d 375, 379 (2010). "The cardinal rule of statutory construction is to determine and give effect to the legislature's intent," which "is best indicated by giving the statutory language its plain and ordinary meaning." *I.H.*, 238 Ill. 2d at 438, 939 N.E.2d at 379. "To determine the plain meaning, we must consider the statute in its entirety and be mindful of the subject it addresses, as well as the legislature's intent in enacting the statute." *I.H.*, 238 Ill. 2d at 438, 939 N.E.2d at 379. "[T]he purpose and policy of the Act is to serve and protect the best interests of minors" and it must be liberally construed. *In re A.P.*, 179 Ill. 2d 184, 197, 688 N.E.2d 642, 649 (1997).

¶ 20    As noted by the parties, section 2-18(4)(b) of the Act (705 ILCS 405/2-18(4)(b) (West 2010)) provides that "[a]ny indicated report filed pursuant to the *** Reporting Act *** shall be admissible in evidence" at the adjudicatory hearing. The trial court relied on section 2-

18(4)(b) as the basis for admitting the State's two exhibits into evidence. There is an absence of case law specifically addressing and interpreting section 2-18(4)(b). However, a review of the relevant statutes, administrative regulations, relevant testimony, and the exhibits at issue shows far more material was entered into evidence through those exhibits than is permitted by section 2-18(4)(b).

¶ 21　The Reporting Act provides for the reporting of suspected cases of abused or neglected children. 325 ILCS 5/4 (West 2010). DCFS is responsible for receiving and investigating those reports. 325 ILCS 5/2 (West 2010). All reports of suspected child abuse or neglect must be made to the central register established by DCFS under the Reporting Act or to the nearest DCFS office. 325 ILCS 5/7 (West 2010). Reports made pursuant to the Reporting Act "shall include, if known, the name and address of the child and his parents or other persons having his custody; the child's age; the nature of the child's condition including any evidence of previous injuries or disabilities; and any other information that the person filing the report believes might be helpful in establishing the cause of such abuse or neglect and the identity of the person believed to have caused such abuse or neglect." 325 ILCS 5/7 (West 2010). The relevant administrative regulations also provide guidance regarding the composition of a report of suspected abuse or neglect, stating an attempt must be made to secure the following information from the reporter:

"a) family composition, including the name, age, sex, race, ethnicity, and address of the children named in the report and any other children in the environment;

b) name, age, sex, race, ethnicity and address of the children's parents, caregiver, if different from the parent(s), and if different, the relationship of the caregiver to the child(ren), and of the alleged perpetrator and his/her relationship to the child subjects;

c) the physical harm to the involved children and an estimation of the children's present physical, medical, and environmental condition. This estimation should include information concerning any previous incidents of suspected child abuse or neglect; and

d) the reporter's name, occupation and relationship to the children, actions taken by the reporter, where the reporter can be reached, and other information the reporter believes will be of assistance." 89 Ill. Adm. Code 300.40 (2012).

¶ 22　Once a report is received, DCFS investigative staff conduct an initial investigation to determine "whether there is reasonable cause to believe that child abuse or neglect exists." 89 Ill. Adm. Code 300.100(a) (2012); see also 325 ILCS 5/7.4(b)(3) (West 2010). If reasonable cause is found, the formal investigation begins. 89 Ill. Adm. Code 300.110(a) (2012). "Upon completion of a formal investigation of abuse or neglect, investigative staff shall make a final determination as to whether a child was abused or neglected" and allegations may be determined to be indicated, undetermined, or unfounded. 89 Ill. Adm. Code 300.110(i)(2) (2012); see also 325 ILCS 5/7.12 (West 2010). An "indicated report" is "any report of child abuse or neglect made to [DCFS] for which it is determined, after an investigation, that credible evidence of the alleged abuse or neglect exists." 89 Ill. Adm. Code 300.20 (2012). See also 325 ILCS 5/3 (West 2010) (" 'An indicated report' means a report made under [the Reporting] Act if an investigation determines that credible evidence of the alleged abuse or neglect exists.").

¶ 23 The term "indicated report" has two components, referring both to the report of suspected child abuse or neglect and the ultimate finding by a DCFS investigator that the report is supported by credible evidence. Here, Ciardini acknowledged that the State's exhibits included the "entire investigation" into the reports of child neglect. While the finding that a report of abuse or neglect is "indicated" is necessarily based upon an investigation into the report, it does not follow that the entire record of the investigation is admissible under the hearsay exception contained in section 2-18(4)(b). In the case at bar, exhibit Nos. 1 and 2 totaled over 200 and over 100 pages, respectively. A review of each exhibit shows it contained far more information than was necessary to show evidence of "indicated reports" involving respondent and her children and also more information than was relevant to the State's particular allegations against respondent.

¶ 24 Even giving the Act the most liberal construction, we find no basis for including an entire DCFS investigatory file within the definition of "indicated report." Here, the trial court erred by admitting the State's exhibits in their entirety on the basis that they constituted "indicated reports" pursuant to section 2-18(4)(b) of the Act.

¶ 25 We note the State argues it is unnecessary for this court to determine whether its exhibits constituted "indicated reports" because they were also admissible as business records under section 2-18(4)(a) of the Act (705 ILCS 405/2-18(4)(a) (West 2010)). That section provides as follows:

"Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter." 705 ILCS 405/2-18(4)(a) (West 2010).

¶ 26 For admission of evidence pursuant to section 2-18(4)(a), the proponent must establish a foundation by showing "the writing was (1) made as a memorandum or record of the condition or event; (2) made in the ordinary course of business; and (3) made at the time of the event or within a reasonable time thereafter." *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 13. "The author of the writing does not need to testify; anyone familiar with the business and its procedures may testify about how the writing was prepared." *J.Y.*, 2011 IL App (3d) 100727, ¶ 13.

¶ 27 As the State points out, Ciardini testified that the State's exhibits contained only documents she used during the regular course of performing her duties as a DCFS investigator and that each exhibit was prepared within a reasonable time after the investigations began. Nevertheless, we also find it would be inappropriate to admit the exhibits in their entirety on this asserted basis.

¶ 28 Initially, we note section 2-18(4)(a)'s hearsay exception for business records was not a basis for admission of the State's exhibits at the adjudicatory hearing. During lengthy discussions of this issue over two different dates, it was a position neither argued for by the

State nor considered by the trial court. Also, as discussed, much of the information in the State's exhibits was unnecessary or irrelevant to its allegations against respondent, and admission of the exhibits under a different statutory subsection would not resolve those issues. Finally, each exhibit contained attachments that likely originated from sources other than DCFS and were merely compiled by the DCFS investigator during the investigatory process. Ciardini, a DCFS investigator, provided limited testimony to support admission of the exhibits through section 2-18(4)(a), and her testimony was not sufficient to show her familiarity with the business or procedures of any entity other than DCFS.

¶ 29    Here, although the trial court erred by allowing the State's exhibits in their entirety into evidence, we also find its error was harmless. Errors in the admission of evidence may be deemed harmless where ample evidence supported the court's neglect finding. *J.Y.*, 2011 IL App (3d) 100727, ¶ 15. In this case, even excluding consideration of the State's exhibits, the trial court's finding that respondent's children were neglected was supported by sufficient evidence.

¶ 30    The State must prove allegations of neglect by a preponderance of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 463-64, 819 N.E.2d 734, 747 (2004). Under the Act, a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2010). "[T]he term 'injurious environment' has been recognized *** as an amorphous concept that cannot be defined with particularity." *Arthur H.*, 212 Ill. 2d at 463, 819 N.E.2d at 746. "In general, however, the term 'injurious environment' has been interpreted to include 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Arthur H.*, 212 Ill. 2d at 463, 819 N.E.2d at 747 (quoting *In re N.B.*, 191 Ill. 2d 338, 346, 730 N.E.2d 1086, 1090 (2000), quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)). Each case must be decided based upon its own unique circumstances. *Arthur H.*, 212 Ill. 2d at 463, 819 N.E.2d at 747. "On review, a trial court's ruling of neglect will not be reversed unless it is against the manifest weight of the evidence" and "[a] finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Arthur H.*, 212 Ill. 2d at 464, 819 N.E.2d at 747.

¶ 31    In this case, the State alleged respondent's children were neglected because their environment was injurious to their welfare. At the adjudicatory hearing, the State presented the testimony of several witnesses, including respondent's son, T.C.; a DCFS caseworker; respondent's probation officer; and respondent's substance-abuse counselor. Evidence showed respondent was on probation and was ordered to obtain a substance-abuse evaluation and treatment. She was referred to a substance-abuse counselor who evaluated her in early 2010. The counselor diagnosed respondent with opioid and cannabis dependance and testified that heroin was respondent's drug of choice. Respondent failed to comply with the counselor's recommendations for treatment.

¶ 32    In June 2010, respondent was hospitalized in connection with the birth of J.H. At that time, she acknowledged to her DCFS caseworker that she had a "positive screen" at the hospital and that just prior to her hospital admission she had taken Tylenol 3 with codeine, a substance for which she did not have a prescription. Most important, however, was the testimony of T.C., who described finding hypodermic needles in various residences he shared with respondent and his siblings. T.C. also testified that while living with respondent in May

-8-

or June 2010, just prior to being taken into protective custody, he observed respondent in the bathroom of the family's home with a belt around her arm and injecting a needle into her arm.

¶ 33   The State's evidence, even without consideration of any portion of its two exhibits, revealed respondent had issues with substance abuse to which she exposed her children. The State's evidence was unrebutted and more than sufficient to sustain its burden. The trial court's neglect finding was not against the manifest weight of the evidence.

¶ 34   For the reasons stated, we affirm the trial court's judgment.

¶ 35   Affirmed.