2023 IL App (2d) 230181-U
No. 2-23-0181
Order filed October 27, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Z.M., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 22-JA-84 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. James M., | ) | Mary H. Nader, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: Respondent forfeited argument that the minor's mother's stipulations were inadmissible at adjudicatory hearing; respondent forfeited argument that DCFS indicated reports were not admissible under Juvenile Court Act; and there was sufficient evidence to establish child was neglected and abused. Affirmed.

¶ 2    Respondent James M.'s appeal arises from the State's petition for adjudication of wardship over the infant, Z.M. Following an adjudicatory hearing, the trial court entered an order dated April 21, 2023, finding Z.M. to be neglected and abused in that his environment was injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2022)) and that his parents, respondent (father) and K.O. (mother), created a substantial risk of physical injury (705 ILCS 405/2-3 (2)(ii) (West 2022)). Following a dispositional hearing, the trial court entered an order dated May 12, 2023, making

Z.M. a ward of the court. Respondent now appeals the trial court's adjudicatory order, contending that the trial court erred in admitting stipulations made by K.O. into evidence, erred in admitting Department of Children and Family Services (DCFS) indicated reports under section 2-18(4)(b) of the Juvenile Court Act of 1987 (Act), and that the order was contrary to the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                  I. BACKGROUND

¶ 4      Respondent and K.O. lived together in Crystal Lake and were unmarried. Respondent and K.O. had one child together, Z.M., who was born on August 30, 2022. From a previous partner, K.O. had another child, L.O., who was born on January 13, 2016. L.O. lived with respondent and K.O. Respondent had two children with a prior paramour: B.M., born July 28, 2007, and W.M., born June 23, 2010.

¶ 5      On September 7, 2022, Z.M. and L.O. were taken into protective custody. The State filed a petition for adjudication of wardship of Z.M. on September 9, 2022, and an amended petition on February 3, 2023. The matter proceeded to an adjudicatory hearing on April 20, 2023.

¶ 6      At the beginning of the hearing, the trial court took judicial notice of an adjudication of neglect which was entered regarding L.O. Relevant to this appeal, the trial court also took judicial notice of K.O.'s stipulations to the following allegations from the State's amended petition.

"The minor, [Z.M.], being under 18 years of age is an abused and/or neglected minor pursuant to 705 ILCS 405/2-3(a) by reason of the following:

a. On or about November 26, 2021, [L.O.] appeared with a nickel-sized bruise on his thigh, which [K.O.] admitted that she gave to him.

* * *

g. Upon information and belief, on December 23, 2021, Crystal Lake police officers responded to a domestic at [K.O.] and [respondent's] residence. [L.O.] was present during the domestic incident. Following the incident, [K.O.] moved out of the residence and to her parents' house with [L.O.].

h. Upon information and belief, [K.O.] again moved back in with [respondent] after the December 2021 incident.

\*\*\*

k. Upon information and belief, on September 6, 2022, [L.O.] came to school and said that [respondent] was yelling at his mother and [Z. M.]. Upon information and belief, school reported that [L.O.] was wetting himself 2-3 times a week at school. Upon information and belief [L.O.] reported that [respondent] is 'mean' and 'yells' at mom.

l. Upon information and belief, [L.O.] has repeatedly said he does not feel safe at home with [K.O.] and [respondent] and that they are always fighting.

m. Upon information and belief, on September 7, 2022, [L.O.] was observed with bruises on his shins and when asked where he got them, [L.O.] reported that [respondent] had struck him.

\*\*\*

o. Upon information and belief, [respondent] has previously failed intact services on two prior occasions with the agency in relation to his other children. Upon information and belief, [K.O.] has previously had one prior intact case with the agency, which resulted in this case opening.

p. Upon information and belief, on or about September 7, 2022, the agency requested to be able to observe [Z.M.] and observe where he slept. Upon information and belief, [K.O.] and [respondent] initially would not allow the worker to observe [Z.M]. Eventually, they allowed the worker to observe the living area and the worker observed [K.O. and respondent] were co-sleeping with the 8-day-old [Z.M.] in a camper[.]

q. Upon information and belief, in the years 2021 and 2022 the Crystal Lake Police Department had over 40 police reports documenting domestic disputes, child custody disputes, or other investigations which involved [respondent] and/or [K.O.].

r. Upon information and belief, [respondent] has been previously indicated by DCFS against his other children, as recently as last year.

s. [Z.M.'s] family has the following history with the Department of Children and Family Services:

1783388A indicated against [respondent] for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect, dated 11/4/2007.

2506106A indicated against [respondent] for Mental Injury; Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect, dated 1/12/2022.

2441468D unfounded against [respondent] for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect, dated 9/9/2021.

2441468E unfounded against [respondent] for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect, dated 9/26/2021.

2501241A indicated against [K.O.] for Cuts, Bruises, Welts, Abrasions, and Oral Injuries; Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect dated 11/26/2021.

2501241B unfounded against [K.O.] for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect, dated 4/8/2022."

¶ 7    The State first called respondent as a witness, and he testified as follows. He had been in a relationship with K.O. for roughly the past two years. He described the relationship as "good and challenging at times." They argued occasionally, but typically not in front of L.O. He denied arguing in front of L.O. and denied getting physical with L.O. or K.O.

¶ 8    During his relationship with K.O., the police had visited his home, but he could not recall how many times, possibly more than 5 times, but he did not believe more than 10 times. The last time the police had been at his house, they had come with a DCFS worker to examine Z.M. Respondent testified that he initially did not allow them to see Z.M., but eventually brought him out for them to examine. They asked respondent to remove Z.M.'s clothes for the examination, which he did.

¶ 9    Respondent testified that he recalled the police coming to the home regarding an incident during which he could not get L.O. to go to sleep. He also recalled the police coming to the home on the day Z.M. was taken into protective custody.

¶ 10    The State then called Officer Matt Smith of the City of Crystal Lake Police Department, who testified as follows. On May 21, 2021, he was dispatched to the area of respondent's home in Crystal Lake for a report of a possible domestic disturbance. Police had received a call from a neighbor who was in his garage located a few houses away. Smith made contact with respondent,

who seemed flustered and said that he was trying to discipline L.O. and was trying to get him to go to sleep. Smith asked if the incident had become physical, and respondent said that it had not.

¶ 11    Smith asked to see the child. Respondent initially said he did not want to get L.O. as they had finally gotten him to go to sleep. Respondent eventually went and got the child. L.O. was crying and had skinned knees that appeared to be scabbed over, but he had no fresh injuries.

¶ 12    The State next called Officer Ingrid Pinto of the Crystal Lake Police Department, who testified as follows. On November 27, 2021, at approximately 4:43 p.m., she was dispatched to respondent's home to assist DCFS in taking L.O. into protective custody. The DCFS agent informed the family that they would need to take L.O. into custody. The family initially did not want to comply, but eventually they cooperated and L.O. was taken into protective custody.

¶ 13    In 2022, Pinto was again called to the home to assist DCFS in taking Z.M. into protective custody. Her sergeant was already on the scene. The sergeant was trying to explain to the family what was happening, but respondent was talking over him and demanding to see paperwork from DCFS as to why they were taking Z.M. K.O. was crying, and respondent was behaving uncooperatively, taking the child back and forth from inside the house to outside. Eventually they convinced respondent to turn over the child, which he did. Pinto did not observe any safety concerns at that time.

¶ 14    The State next called Victoria Benhart, who testified as follows. She was an intact worker at Arden Shore Child and Family Services. She was assigned as a caseworker with the family on January 5, 2022, regarding an intact case with L.O. The intact case was initiated in response to an indicated report that L.O. had bruising on his inner thigh and that K.O. had pinched him. Benhart had worked closely with L.O. during his intact case and then briefly with Z.M. While L.O.'s case was ongoing, another report came in that Z.M. was born with cannabis in his system.

¶ 15    At the time the cases involving [L.O.] opened, respondent was involved in a separate intact case involving a former paramour and his other children, B.M. and W.M. That case closed in April 2022, when the children were placed with their mother, who had cooperated with the recommended services.

¶ 16    Respondent was offered mental health services throughout L.O.'s case, but he denied services at that time. For the first six weeks she was assigned to the case, Benhart visited the home once a week, and then afterwards twice monthly. During those visits she would have brief interactions with respondent. She described him as sometimes cooperative and sometimes not. Towards the end of the intact case, Benhart tried to make contact with K.O. and Z.M., and respondent did not let her see Z.M. or speak with K.O. She was attempting to determine if there were appropriate sleeping accommodations for Z.M.

¶ 17    There was an instance when Benhart went to speak with respondent following Z.M.'s birth, regarding the report of cannabis in his system. When she arrived at the house, respondent instantly exited and said, "You're not welcome, we're going to call the police." She then left, because respondent was walking towards her in an intimidating manner, and she feared for her safety.

¶ 18    On the day Z.M. was taken into protective custody, Benhart and a DCFS investigator went to the home. They ended up having to call the police to assist in their investigation, as respondent was taking photographs and video of their vehicles. Respondent was flustered, angry, upset, and uncooperative.

¶ 19    Benhart was concerned for Z.M.'s safety because at the time they removed [L.O.] from the home, he had bruising on his shins and said that respondent had hit him. Additionally, there were several incidents through the case when K.O. left the home following "periods of escalation" in her relationship with respondent.

¶ 20    Based on her interactions with respondent, she recommended mental health, substance abuse, and domestic violence services. The recommendation of domestic violence services was based on reports that respondent would turn off K.O.'s phone, "take finances from her," and was verbally abusive towards her. The recommendation for mental health services was based on the recommendations that were made in the intact case involving B.M. The substance abuse recommendations were based on the fact that K.O. and respondent shared a home and K.O. had tested positive for substances.

¶ 21    State's Exhibits 1 through 3 were admitted into evidence over respondent's objection following the testimony of DCFS investigators Dionca Harper, Denise Pascoal, and Sharon Rademacher, respectively. Each testified that their respective exhibits were kept in the regular course of business, and that they were created by a person with knowledge of the contents contained therein at or near the time of their occurrence.

¶ 22    State's Exhibit 1 was an indicated report dated November 26, 2021, arising from the discovery of a nickel sized bruise on L.O.'s thigh. The narrative portion of the report read as follows:

> "Today, a bruise was seen on [L.O.] (age 5), on his left, upper thigh that is the size of a nickel and is bluish-yellow in color. [L.O.] lives with his mother, [K.O.] and [K.O.]'s paramour, [respondent]. [K.O.] states that she gets frustrated raising [L.O.] on her own and pinched [L.O.] and that is how [L.O.] got the bruise. Reporter does have photos of the bruise. *** [K.O.] and [respondent] both spank [L.O.], and sometimes [respondent] leaves a mark. [K.O.] is a recovering heroin addict and relapsed with whiskey over the weekend."

¶ 23    A contact note dated November 27, 2021, indicated that Harper, along with Crystal Lake police officers Green and Pinto, visited the home.

> "[K.O.] stated that [L.O.] has a tiny mark on him and that she pinched him Tuesday as a form of discipline. *** While speaking with [K.O.], [respondent] continued to cut her off when trying to answer questions. CPI [(Child Protection Investigator)] advised that due to the allegations and contents of report that a safety plan will need to be in place. CPI began explaining the reasons for safety plan and [respondent] interrupted stating that [K.O.] was not going to agree to a safety plan and that the child was not going to be removed from the home. CPI explained to [respondent] that the decision is [K.O.'s] as she is the biological parent for [L.O.] and is responsible for his safety and well-being. [Respondent] stated that he has been in his life for 8 months. This continued for some time, with [respondent] making demands and at one point attempted to kick CPI and LE [(Law Enforcement)] out the home."

The conversation then continued, while respondent left the house. "Once he retu[r]ned to the home [K.O.] shut down and looked to him when answering questions."

¶ 24    Exhibit 1 also contained a child abuse/neglect report dated December 30, 2021, detailing an anonymous hotline call that was made to DCFS:

> "On 12/26/2021 at 2:00 PM, [K.O.] contacted me and spent several hours at my home describing financial extortion and emotional manipulation of her by [respondent]. She also expressed that [respondent] was "rough" with her child [L.O.], and that she and her son [L.O.] had been living with [respondent] in uninhabitable conditions at his home ***. At that time, [K.O.] said she didn't feel

safe with [respondent], and didn't feel that her son was safe either, and that Child Protective Services had an open case on [L.O.] already, due to unexplained bruises on [L.O.] She had asked the police to be involved in recovering her property from [respondent], as she didn't feel safe in his physical presence. At that time, [K.O.] had decided to move back home with her parents and was requesting support from her mother *** to separate from [respondent]."

¶ 25    The report concluded that the allegations against K.O. were indicated, and the allegations against respondent were unfounded as L.O. denied that respondent used corporal punishment with him.

¶ 26    Exhibit 2 was an indicated report dated January 12, 2022, alleging that respondent caused mental injury to B.M. and created a substantial risk of physical injury or an environment injurious to health and welfare toward W.M.

¶ 27    The narrative portion of the report was as follows:

"[Respondent] is mentally abusive towards [B.M.] [Respondent] harasses [B.M.] by constantly calling and coming by the home. [Respondent] isn't supposed to enter the home. Recently, exact date unknown, [respondent] came by the home and [B.M.] locked herself in the bathroom. The police had to be called for assistance. There is history of DCFS activity with [respondent] because he would watch [B.M.] shower and ask to wash her hair. [Respondent] has forced [B.M.] to write letters alleging OPWI [(Other Person with Information)] is abusive and he refuses to allow [B.M.] to cut her hair. [Respondent] triggers [B.M.]'s mental health issues, which cause [B.M.] to have suicidal thoughts. [Respondent] has undiagnosed mental health problems and has refused to get a formal diagnosis or

help. [B.M.] feels very stuck and feels like she'll never be free of [respondent]. Reporter believes something is just not right and [respondent] is treating [B.M.] just like he treated OPWI. [B.M.] saw [respondent] over the weekend. [Respondent] calls [B.M.] every day wanting to know if she's going to visit him. [Respondent] has even taken to calling [B.M.'s] boyfriend's parents' phone numbers and asks them questions about [B.M.] OPWI has used a lot of financial resources for legal help to stop [respondent] from behaving in this manner. OPWI once said [respondent] sent her over 100 text messages about [B.M.] coming to visit him. [Respondent] accused OPWI of not sending the messages when [B.M.] said she didn't want to go. [Respondent] is reportedly obsessive when it comes to [W.M.] However, the extent of the obsession is unknown. *** There are no formal diagnoses for [B.M.] Reporter believes [B.M.] suffers from PTSD and depression. History of DV [(Domestic Violence)]. Arden Shore is a positive support. Prior DCFS involvement. A history of [respondent] owning a gun. A lot of police involvement."

¶ 28 The report concluded that the allegations regarding B.M. were indicated, and those regarding W.M. were unfounded. Regarding the indicated recommendation for mental injury to B.M., the report stated:

"Allegation 17-Mental Injury is recommended to be indicated. Due to the written document provided by [B.M.]'s individual therapist and the ongoing depressive symptoms and suicidal ideation along with her voicing her feelings of being 'trapped' and 'not wanting to participate in visitation due to ongoing arguments where she feels her voice is not being heard' is evidence enough to

support a recommended finding. Respondent was participating in Intact Services and had begun individual therapy but once [B.M.]'s mother did not want to continue with the Intact case respondent disengaged in therapy and Intact Caseworker Jazmin Ortiz reported little to no progress made as respondent continued to blame [B.M.] and her mother for [B.M.]'s lack of willingness to participate in visitation. CPI [(Child Protection Investigator)] also witness [*sic*] during unannounced visit for final CERP [(Comprehensive Environmental Review Process)] [respondent] screaming, yelling, swearing, slamming objects inside the home with the windows open yelling at [B.M.] which was verified by [B.M.]'s younger brother who was outside, [B.M.] and [respondent]."

¶ 29 State's Exhibit 3 was an indicated report dated September 6, 2022. The narrative portion of the report was as follows:

"[L.O.] has been having bathroom accidents approximately 2-3 times per week since the start of school. [L.O.] came in today saying he wet his pants. [L.O.] was given a change of underwear and pants. After coming out of the bathroom, [L.O.] was noted to have stool on his shirt and underwear band. [L.O.] returned to bathroom. Stool present between legs and on backs of thighs. [L.O.] states he needs help cleaning. [L.O.] assisted with cleanup and then changed into clean clothing. Prior to this incident, [L.O.] inquired as to whether his Unknown (nana and papa) are "on the list". [L.O.] states that his mom [K.O.] and [respondent] are going to be fighting all day. Reporter asked how he knew that and he said they were fighting this morning. [L.O.] stated that his mom woke him up at 7:59 this morning to take him to his nana and papa's house. When asked why, he stated that [respondent] was

being mean to his mom and the baby. He stated that [respondent] brought the baby outside (I'm not sure what he meant by that or if there was something more to that). [L.O.] also asked me for new shoes. I told him to ask mom and he said that his mom told him to ask me for new shoes. I am concerned that [L.O.], his mom, and the new baby are in an abusive and unstable environment."

¶ 30    The report concluded that the allegations were indicated against respondent and K.O. for creating a substantial risk of physical injury or environment injurious to the health and welfare for both L.O. and Z.M. The report found that respondent argued with K.O. in the presence of the minor children. L.O. expressed that he "gets hit" by respondent and that he is afraid of respondent. K.O. has fled the home on more than one occasion. It also indicated that K.O. and respondent had ceased engaging with intact family services and were co-sleeping with Z.M. in a camping trailer while the home was being renovated. Additionally, a supervisory note from Andrea Lyons indicated that Z.M. was born with THC (Tetrahydrocannabinol) in his system.

¶ 31    At the close of the State's case, respondent moved for a directed finding, which was denied. Respondent chose to present no evidence, and the trial court adjudicated Z.M. abused and neglected.

¶ 32    In rendering its decision, the trial court stated:

"Based on the stipulations of [K.O.] and based on the testimony that I have received, specifically, the testimony of Officer Matt Smith and the office—or the testimony of Ingrid Pinto; and more importantly, the DCFS investigators Dionca Harper and Denise Pascoal, who talked about—and Sharon Rademacher, who talked about past indicated reports against [respondent]. There was a child [B.M.],

who—that was the first I heard of [B.M.], a 14-year-old, and it was indicated against him actually just January of this year.

So the question is whether or not the environment is injurious. And with the [40] calls—I don't know what those calls were for, but I can tell you it said [40].

\*\*\*

Over 40 police reports documenting domestic abuse, child custody disputes, or other investigations, which involved the paramour and the mother. So it wasn't a lost kitten. It wasn't a noise dispute. It was domestic, child custody, or other investigations. So I don't think a child should live in a household where there's over 40 police reports in that short period of time.

So I do find that the environment is injurious. I do find that because of the injurious environment that the child is at substantial risk of abuse or neglect. And that the child will be made a ward of the court and custody will be given to the Department of Children and Family Services. And I will set the matter for the disposition hearing \*\*\*."

¶ 33    A dispositional hearing was held on May 12, 2023, after which the trial court found K.O. unfit to care for Z.M., found respondent unfit and unable to care for Z.M., and set a permanency goal of return home within 12 months.

¶ 34    Respondent timely appealed.

¶ 35                                             II. ANALYSIS

¶ 36 On appeal, respondent argues that the trial court erred in admitting the stipulations of K.O. into evidence against him, the trial court erred in admitting the entirety of State's Exhibits 1-3, and that the trial court's adjudicatory order was against the manifest weight of the evidence.

¶ 37 "A proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." (Internal quotations omitted.) *In re A.P.*, 2012 IL 113875, ¶ 18. Pursuant to the Act, the trial court must engage in a two-stage process to determine whether a minor should be made a ward of the court. *Id.* The first stage is the adjudicatory hearing, "where the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-21(1) (West 2022). If the court finds the minor to be abused, neglected, or dependent, the matter proceeds to the second-stage dispositional hearing to determine "whether it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." *Id.* § 2-21(2). Respondent is challenging only the trial court's decision at the adjudicatory hearing.

¶ 38                          A. Stipulations of K.O.

¶ 39 Respondent argues that it was improper for the trial court to accept K.O.'s stipulations as admissions of respondent. In our review of the record, respondent made no objection to the admission of K.O.'s stipulations at the adjudicatory hearing. Issues not raised in the trial court are forfeited and cannot be raised for the first time on appeal. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 377 (2008). However, even were we to set aside the issue of forfeiture, respondent's arguments are not persuasive.

¶ 40 The admissibility of evidence is within the discretion of the trial court, and we will not disturb its decision absent an abuse of discretion. *In re A.W., Jr.*, 231 Ill. 2d 241, 256 (2008). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or

unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 41    In support, respondent cites our decision, *In re T.C.*, 2021 IL App (2d) 200691. That case involved admissions made by a non-custodial father, who was not involved in the care of the child and was identified as the father from among three other putative fathers following a DNA test. *Id.* ¶ 5. Over the mother's objection, the trial court accepted the stipulations and admissions of the father on the State's two counts and entered an order of adjudication finding the child to be neglected and dependent. *Id.* ¶ 10.

¶ 42    On appeal, we found that while the trial court properly admitted the stipulations and admissions of the father, and that he could be bound by them, the father's admissions were not admissible against the mother. *Id.* ¶ 22. We noted that aside from the State's exhibits regarding the mother's mental health, no additional incriminating evidence or stipulations were admitted into evidence. *Id.* ¶ 21. Additionally, we made clear that our holding was based on the fact that the admissions were made by a non-custodial parent who had no personal knowledge regarding the State's claims. *Id.* ¶¶ 20, 22.

¶ 43    In instances where the custodial parent does have personal knowledge regarding the factual basis of the petition, "[a] custodial parent's admission and stipulation, *by itself*, may be sufficient to support a finding of abuse or neglect." (Emphasis in original.) *In re R.B.*, 336 Ill. App. 3d 606, 616 (2003). Being the case, it is still important for the trial court to consider the factual basis of such a stipulation as a "situation could arise in which neither the custodial parent nor any other credible person has personal knowledge of the circumstances alleged in the State's petition[.]" *Id.*

¶ 44    In the instant case, there is nothing to indicate that K.O. did not have sufficient knowledge of the circumstances to which she stipulated. To the contrary, K.O. had direct knowledge of all

relevant circumstances pertaining to Z.M.'s environment, which K.O. shared. Further, the trial court conducted a full adjudicatory hearing, including testimony of police officers and DCFS staff, in addition to the stipulations of K.O. Accordingly, even were we to set respondent's forfeiture aside, the trial court did not abuse its discretion in admitting the stipulations of K.O.

¶ 45                                B. DCFS Reports

¶ 46    Respondent argues that the trial court abused its discretion in admitting State's Exhibits 1-3, the three DCFS indicated reports, into evidence. Section 2-18 (4)(b) of the Act (705 ILCS 405/2-18(4)(b) (West 2022)) provides that any indicated report filed pursuant to the Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.* (West 2022)) shall be admissible in an abuse, neglect, or dependency proceeding.

¶ 47    "The term 'indicated report' has two components, referring both to the report of suspected child abuse or neglect and the ultimate finding by a DCFS investigator that the report is supported by credible evidence." *In re J.C.*, 2012 IL App (4th) 110861, ¶ 23.

¶ 48    Respondent maintains that the reports "contained far more than necessary to show evidence of an indicated report[,]" citing *In re J.C.*, 2012 IL App (4th) 110861, ¶ 23, in support of his position. However, respondent does not otherwise explain what portions of the exhibits he believes exceeded the bounds of an indicated report. By failing to identify what portions of the exhibits were admitted in error, respondent leaves it to us to scour through the reports and guess which portions he finds objectionable. " 'A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' " *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 474-75, (2010) (quoting *Pecora v. Szabo*, 109 Ill. App. 3d 824, 825-26 (1982)). Points not so developed are forfeited. *In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 70; see also Ill. S.

Ct. R. 341(h)(7) (eff. May 25, 2018) ("Argument *** shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on," and "[p]oints not argued are forfeited.").

¶ 49 Even were we to set aside respondent's forfeiture once more, our review of the reports does not reveal any material that is inadmissible. Apart from summaries of the reports received and DCFS's conclusions as to whether the reports were indicated, the exhibits contain safety and risk assessments, safety plans, substance abuse and domestic violence screenings, and contact notes. We make no determination as to whether these materials exceeded what was necessary to show evidence of indicated reports. See *In re J.C.*, 2012 IL App (4th) 110861, ¶ 24 (entire DCFS investigatory file exceeds definition of indicated report). However, to the extent that these materials may exceed what is included in the definition of an indicated report, they constitute service plans and DCFS investigative records, which are generally "admissible under section 2-18(4)(a) of the Juvenile Court Act [705 ILCS 405/2-18(4)(a) (West 2022)], which is a variation of the business record exception to the hearsay rule." *In re D.D.*, 2022 IL App (4th) 220257, ¶ 41.

¶ 50 To establish a foundation under section 2-18(4)(a), "the proponent must show the writing was (1) made as a memorandum or record of the condition or event; (2) made in the ordinary course of business; and (3) made at the time of the event or within a reasonable time thereafter." *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 13. It is not necessary for the author of the record to testify, as anyone familiar with the business and procedures may provide such foundation. *Id.* In the instant case, the State's witnesses laid the proper foundation for the admission of State's Exhibits 1-3 under section 2-18(4)(a). We may affirm on any ground supported by the record. *Tillman v. Pritzker*, 2021 IL 126387, ¶ 24. Accordingly, even were we to set respondent's forfeiture aside, the trial court did not abuse its discretion in admitting State's Exhibits 1-3.

¶ 51                              C. Sufficiency of the Evidence

¶ 52    At the adjudicatory hearing, the trial court considers "only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-21 (1) (West 2022). The focus of the adjudicatory hearing is solely whether the child has been abused, neglected, or dependent, not to determine who may be responsible or to assess the portion of blame attributable to those individuals. *In re Arthur H.*, 212 Ill. 2d 441, 465 (2004).

¶ 53    Respondent makes repeated arguments throughout his brief that the State either failed to prove certain allegations "against him" or that the State failed to present evidence that respondent engaged in certain actions. In an adjudicatory hearing however, the sole question at issue is whether the minor was abused, neglected, or dependent, not who is responsible. Accordingly, we restrict our analysis to whether there was sufficient evidence to find Z.M. abused or neglected.

¶ 54    "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis,* and must be decided on the basis of their unique circumstances." *Id.* at 463. "It is the State's burden to prove allegations of neglect by a preponderance of the evidence." *In re A.P.*, 2012 IL 113875, ¶ 17.

¶ 55    The trial court found Z.M. to be neglected and abused in that his environment was injurious to his welfare (705 ILCS 405/2-3 (1)(b) (West 2022)), which created a substantial risk of physical injury (705 ILCS 405/2-3 (2)(ii) (West 2022)). Neglect is defined as the failure to exercise the care that circumstances justly demand, and "encompasses wilful [*sic*] as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotations omitted.) *In re A.P.*, 2012 IL 113875, ¶ 22. The term injurious environment is an amorphous concept, but generally includes the breach of a parent's duty to ensure a safe and nurturing shelter for the child. *Id.*

¶ 56    Respondent argues that the trial court improperly found Z.M. to be neglected based on an injurious environment, stemming from a theory of anticipatory neglect. Respondent further argues that because the trial court erred in its finding that Z.M. was neglected based on an injurious environment, we should likewise find that the trial court erred in finding Z.M. abused based on a substantial risk of physical injury created by the injurious environment.

¶ 57    "Sibling abuse may be *prima facie* evidence of neglect based upon an injurious environment." *In re S.S.*, 313 Ill. App. 3d 121, 127 (2000).

> "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d at 468.

Abuse of a sibling may be *prima facie* evidence of anticipatory neglect, however, this presumption fades with time. *In re S.S.*, 313 Ill. App. 3d at 127-28. There is no *per se* rule that the neglect of one child conclusively establishes the neglect of another, and the court must consider not only the prior abuse to the other child, but also the care and condition of the child in question. *In re Arthur H.*, 212 Ill. 2d at 468.

¶ 58    Respondent argues that the November 26, 2021, indicated report occurred before Z.M. was born and had "absolutely nothing to do with [him]." Likewise, respondent argues that the January 12, 2022, indicated report regarding mental injury to B.M. was closed in April 2022, and there was no indication that father failed to complete services. Respondent makes no arguments regarding the September 7, 2023, indicated report.

¶ 59    We do not find respondent's arguments persuasive. When viewed as a whole, the evidence paints a clear picture of an ongoing pattern of domestic abuse on the part of respondent, which has not improved with time.

¶ 60    While the November 26, 2021, indicated report was initiated because of a bruise K.O. gave L.O., additional narrative reports describe instances of domestic disturbances between respondent and K.O., K.O. leaving the home because she felt unsafe, and a report that K.O. described respondent as financially extorting and emotionally manipulating her.

¶ 61    The January 12, 2022, report likewise demonstrates emotionally manipulative and abusive behavior towards B.M., which in many ways mirrors the behavior respondent displayed towards K.O. Additionally, Benhart testified that the only reason the intact case with B.M. closed was because B.M.'s mother had completed services and B.M. was placed with her.

¶ 62    Additionally, in the September 6, 2022, report, L.O. stated that respondent had been fighting with K.O. that morning, and that respondent woke L.O. up at 7:59 a.m. to take him to his grandparents' house because respondent was being mean to K.O. and Z.M. When L.O. was taken into protective custody he had injuries on his shins and reported that respondent had hit him.

¶ 63     Coupled with the testimony of the police officers and DCFS workers, as well as K.O.'s stipulations, there was sufficient evidence to find that Z.M.'s environment was injurious to his welfare based on a theory of anticipatory neglect.

¶ 64    Further, as the State argues, there was sufficient evidence to find Z.M. neglected based on an injurious environment absent the abuse to L.O. and B.M. Z.M. was born with THC in his system, K.O. and respondent were living in a camping trailer which was too small to provide a safe sleeping arrangement, and the domestic violence concerns which were causing distress to L.O.

were still present at the time of Z.M.'s birth, with L.O. stating that respondent "was being mean to his mom *and the baby*." (Emphasis added.)

¶ 65    Accordingly, there was sufficient evidence for the trial court to find that Z.M. was abused and neglected by a preponderance of the evidence.

¶ 66                        III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 68    Affirmed.